436 So.2d 1056 (1983)
STATE of Florida, Appellant,
v.
Juan AMARO, Juan Alejandro Rodriguez and Sergio Jesus Villegas, Appellees.
No. 82-1261.
District Court of Appeal of Florida, Second District.
August 31, 1983.
*1057 Jim Smith, Atty. Gen., Tallahassee and Peggy A. Quince, Tampa, for appellant.
James V. Dominguez, Tampa, for appellee Amaro.
Nestor Castillo, Jr., Tampa, for appellee Rodriguez.
Raul C. Palomino, Jr., Tampa, for appellee Villegas.
RYDER, Judge.
The question presented in this appeal is one which has not yet been specifically addressed by the courts of Florida: Can one who is apprehended while in the commission of a drug felony, moments before a co-felon shoots and kills a police officer while attempting to avoid apprehension, successfully claim that he is not accountable under the felony-murder statute for the killing of the officer?

I. FACTS.
In February 1982, an information was filed charging the three appellees, Juan Amaro, Juan Allejandro Rodriguez and Sergio Jesus Villegas, with murder in the third degree (felony murder), delivery of cannabis, and two counts of possession of cannabis. The facts have been gathered from various motions to dismiss and traverses filed with the trial court.
During June 1981, Detective Peterson of the Tampa Police Department met appellee Amaro, the latter being unaware of Peterson's police affiliation. Amaro subsequently introduced Peterson to appellee Rodriguez. The three discussed the possibility of *1058 a sale of marijuana to Peterson. Amaro also acted as a translator.
On July 23, 1982, appellee Villegas, after telephonically communicating with Rodriguez, drove with one Carlos Bello and one Dorta from Miami to Tampa. They proceeded to the residence of Rodriguez.
In the early morning of July 24, 1981, Detective Peterson and Amaro went to the residence of Rodriguez. The purchase price of $13,500.00 was settled upon. The three agreed that the exchange of marijuana and money would take place at 6:00 p.m. on the same day. Shortly before 6:00 p.m., Detective Peterson met with Amaro at which time Amaro stated that the deal was set. Peterson and Amaro drove to Rodriguez' house and were invited inside by Rodriguez. Dorta was seated on the front porch; Bello was at or near the northeast bedroom door. Bello motioned Peterson and Amaro to that bedroom. Rodriguez, Amaro, Villegas, Bellow and Peterson were all in the bedroom when Rodriguez pointed to two cardboard boxes and spoke to Amaro in Spanish. Amaro then told Detective Peterson "that's it." Amaro wanted to smoke and test the marijuana. Peterson visually inspected the marijuana. Amaro offered to go to Peterson's car for rolling papers, but Peterson indicated he would go to the car himself.
From the automobile, Peterson obtained rolling papers, $13,500.00, and an electronic device with which to signal back-up officers situated in the area that the deal had been consummated or that he needed assistance. When Peterson returned to the northeast bedroom, Amaro rolled and smoked a marijuana cigarette. Bello counted the money handed to him by Peterson and indicated that another fifty pounds of marijuana was available if Peterson could get the additional money which it would cost.
Peterson attempted to activate the signal device, but it malfunctioned. He stalled for time by asking to weigh the marijuana. Villegas left the room, then returned with a scale. Peterson went to a restroom and successfully activated the electronic signal. Back-up officers responded and entered the residence.
Upon entering the house, Detective Ulrickson observed movement around the northeast bedroom. He saw Rodriguez close the bedroom door. Ulrickson kicked the door open, pointed his gun at Rodriguez, and told Rodriguez: "Hold it! Police." Ulrickson then perceived movement from a corner of the bedroom and saw muzzle flash from that direction. Bello shot and wounded Ulrickson. Ulrickson noted that Rodriguez was lying motionless on the floor; Rodriguez had also been shot.
Some ten seconds later, Detective Rauft attempted to open the door to the northeast bedroom. Bello fired two shots through the door, killing Rauft.
Before the shooting took place, but after the police rushed the house, appellee Amaro was seen by Detective McAllister running in the back yard toward a fence. McAllister ordered Amaro to stop, but Amaro continued his efforts to escape and tried to climb or jump over the fence. McAllister grabbed Amaro, pulled him from the fence, threw him to the ground, and struck him. Immediately thereafter, McAllister heard the gunshots fired in the northeast bedroom.
Also before the shooting, appellee Villegas went to the southeast bedroom. Detective Mock followed Villegas and, with gun drawn, told Villegas: "Freeze, you're under arrest," or "Police, don't move." Mock then heard the first set of shots from the northeast bedroom, saw Detective Ulrickson fall into the bedroom and the door close. Mock exited the southeast bedroom, closed the door to that room, and joined Detective Rauft outside the door to the northeast bedroom. The second set of shots were fired through the northeast bedroom door, striking Rauft. A short period of time later, Mock ordered Villegas out of the southeast bedroom and Villegas complied. Thereafter, the premises were secured.

II. PROCEEDINGS BELOW.
All three appellees filed motions to dismiss pursuant to rule 3.190(c)(4), Florida Rules of Criminal Procedure. The circuit *1059 court considered the facts presented in the motions, in responsive pleadings, and at a hearing, and granted each appellees' motion to dismiss the third degree murder charge. The state timely filed its notice of appeal. Rule 9.140(c)(1)(A) and (c)(2), Fla.R.App.P. We have jurisdiction. Rule 9.130, Fla.R. App.P.

III. APPLICABLE LAW.
The charge involved in this appeal is codified in section 782.04(4), Florida Statutes (1981). The statute provides:
(4) The unlawful killing of a human being, when perpetrated without any design to effect death, by a person engaged in the perpetration of, or in the attempt to perpetrate, any felony other than any arson, sexual battery, robbery, burglary, kidnapping, aircraft piracy, or unlawful throwing, placing, or discharging of a destructive device or bomb, shall be murder in the third degree and shall constitute a felony of the second degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
While there are no cases dealing specifically with third degree felony murder under the circumstances involved in this case, principles from first and second degree felony murder, as well as cases from other jurisdictions, are instructive.
Initially, it is clear that in a criminal case a motion to dismiss is to be "granted only where the most favorable construction to the state would not establish a prima facie case of guilt." State v. Davis, 243 So.2d 587 (Fla. 1971). If reasonable men could find guilt, a jury question exists and the motion should be denied. The facts are to be reviewed by the court in the light most favorable to the state and only where they do not establish such a prima facie case should dismissal be granted. State v. Hudson, 397 So.2d 426 (Fla. 2d DCA 1981).
In dismissing the third degree murder charge, the conclusion of the trial court was that the appellees' participation in the underlying drug felony had come to an end prior to the killing of Detective Rauft. The appellees argued, and the trial court agreed, that the appellees' participation in the underlying felony had terminated when they were arrested.[1] It has been held that there are four elements involved in effectuating an arrest:
(1) A purpose or intention to effect an arrest under a real or pretended authority;
(2) An actual or constructive seizure or detention of the person to be arrested by a person having present power to control the person arrested;
(3) A communication by the arresting officer to the person whose arrest is sought, of an intention or purpose then and there to effect an arrest; and
(4) An understanding by the person whose arrest is sought that it is the intention of the arresting officer then and there to arrest and detain him.
Melton v. State, 75 So.2d 291, 294 (Fla. 1954); McAnnis v. State, 386 So.2d 1230 (Fla. 3d DCA 1980).
For purposes of this appeal only, we will accept as correct the trial court's determination that appellees Amaro and Villegas were under effective arrest by the officers when Detective Rauft was killed. However, the trial court's determination as to appellee Rodriguez is unclear. From the record, it appears that the trial court believed Rodriguez was either under effective arrest or was incapacitated by the first set of shots fired by Bello. On one or both of these grounds, the trial court determined that the participation of Rodriguez in the underlying felony had already ended by the time Detective Rauft was shot and killed. Under the circumstances presented, we believe all three appellees' motions to dismiss were erroneously granted.
In the felony murder context, the intent of the appellees need not be an intent to commit a homicide. The intent *1060 which would support a conviction of third degree murder is the intent to participate in the underlying felony. Adams v. State, 341 So.2d 765 (Fla. 1976), cert. denied, 434 U.S. 878, 98 S.Ct. 232, 54 L.Ed.2d 158 (1977). See Goodwin v. State, 405 So.2d 170 (Fla. 1981); Henderson v. State, 70 So.2d 358 (Fla. 1954); State v. Williams, 254 So.2d 548 (Fla. 2d DCA 1971).[2]
Appellees were charged with delivery and possession of cannabis. Section 893.13(1)(a)(2) and section 893.13(1)(e), Fla. Stat. (1981). These crimes are felonies which can support a charge of third degree murder under section 782.04(4), Florida Statutes (1981).[3] Thus, the intent of the appellees to participate in the delivery or possession of cannabis is a sufficient intent to support the charging and prosecution of appellees for the homicide of Detective Rauft pursuant to the third degree felony murder statute.[4]
The primary point of contention between the parties, then, is what affect has the arrest of Amaro and Villegas and the arrest or incapacitation of Rodriguez on their liability for third degree murder, assuming that the appellees are found on remand to have had the intent to participate in the underlying felony or felonies.
The state has argued that the appellees' participation in the underlying felonies had not ceased when Detective Rauft was killed. The state's argument is based on the theory that the underlying felonies did not terminate if even one of the co-felons was actively attempting to escape and his participation in the underlying felony had not otherwise terminated. Hornbeck v. State, 77 So.2d 876 (Fla. 1955); People v. Boss, 210 Cal. 245, 290 P. 881 (1930). The state places some emphasis on the fact that the entire episode, from entry to Rauft's death, took place over a period of time of less than twenty seconds.
The state also has argued to this court that one who participates with others in a common criminal scheme is liable for all offenses committed in furtherance of the scheme, regardless of whether or not the individual physically participates in the commission of the additional crime. Jacobs v. State, 396 So.2d 713 (Fla. 1981); Hornbeck, supra; Mills v. State, 407 So.2d 218 (Fla. 3d DCA 1981).
The appellees have maintained that their arrest prior to the killing of Rauft ended their participation in the underlying drug felony and thus precluded their liability for the homicide. In support, appellees cite State v. Milam, 108 Ohio App. 254, 156 N.E.2d 840 (Ohio Ct. App.), on retrial, 163 N.E.2d 416 (Ohio Misc. 1959); Mills, supra; Collier v. State, 244 Ga. 553, 261 S.E.2d 364 (1979), cert. denied, 445 U.S. 946, 100 S.Ct. 1346, 63 L.Ed.2d 781 (1980); People v. Goree, 30 Mich. App. 490, 186 N.W.2d 872 (1971). Furthermore, it is contended that the shooting of Rauft was not the predictable result of the marijuana transaction, but was an independent act of Bello not in furtherance of the common scheme. Finally, appellee Rodriguez argues that in addition to the foregoing, his own injury caused a sufficient definitive break in his participation in the underlying felony so as to preclude his liability for the killing of Rauft.
The weight of authority, with which we agree, is in accord with the position put forward by the state.
It is well settled that a felon is liable for the acts of his co-felons. Likewise, there is liability for the acts of a felon on *1061 the part of one who aids and abets the commission of a felony. The result is not changed by the fact that prior to the perpetration of the underlying felony, there was no premeditated design on the part of any of the felons to commit a homicide. Campbell v. State, 227 So.2d 873 (Fla. 1969), cert. dismissed, 400 U.S. 801, 91 S.Ct. 7, 27 L.Ed. 33 (1970); Hornbeck, supra; Henderson, supra. See also Hawkins v. State, 436 So.2d 44 (Fla. 1983). It is not even necessary that the accused be present at the time of the killing perpetrated by a cohort. Goodwin, supra; Adams, supra; Miller v. State, 409 So.2d 109 (Fla. 3d DCA 1982). Of course, the homicide must have been committed in furtherance of the common criminal scheme, or as a probable, predictable, reasonably foreseeable, or causally connected result of the underlying felony. Bryant v. State, 412 So.2d 347 (Fla. 1982); Jacobs, supra; Campbell, supra; Pope v. State, 84 Fla. 428, 94 So. 865 (1922); Mills, supra. See Christian v. United States, 394 A.2d 1 (D.C. 1978), cert. denied, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d (1979); Haskell v. Commonwealth, 218 Va. 1033, 243 S.E.2d 477 (Va. 1978); State v. Hokenson, 96 Idaho 283, 527 P.2d 487 (1974); People v. Mitchell, 61 Cal.2d 353, 392 P.2d 526, 38 Cal. Rptr. 726 (1964), cert. denied, 384 U.S. 1007, 86 S.Ct. 1985, 16 L.Ed.2d 1021 (1966); Commonwealth v. Doris, 287 Pa. 547, 135 A. 313 (1926).
Case law has also made clear that a felon is liable for a homicide committed by a co-felon during the latter's attempt to escape from the scene of the underlying felony. Such a killing is considered to be a part of, and in furtherance of, the felony. Campbell, supra; Hornbeck, supra; People v. Salas, 7 Cal.3d 812, 500 P.2d 7, 103 Cal. Rptr. 431 (1972), cert. denied, 410 U.S. 939, 93 S.Ct. 1401, 35 L.Ed.2d 605 (1973); People v. Goree, supra; People v. Jackson, 20 N.Y.2d 440, 231 N.E.2d 722, 285 N.Y.S.2d 8 (1967), cert. denied, 391 U.S. 928, 88 S.Ct. 1815, 20 L.Ed.2d 668 (1968).
The appellees were engaged with their cohorts in felonious activity. They made the facts. They created the situation at the residence of Rodriguez. Appellees Villegas and Amaro attempted to flee when back-up police officers entered the house. Appellee Rodriguez sought to close the door of the bedroom where he and Bello were situated. Bello attempted to escape capture by shooting his firearm at the police. In fact, Bello emptied his weapon in shooting at the officers. The time frame was extremely short: it was an immediate, continuous, developing situation. In our view, Bello's response may be found to be a foreseeable, predictable result of the commission of a drug felony, and of the attempt by law enforcement officers to apprehend the individuals involved. Recent history has shown that the potential for violence in a drug related felony, particularly in Florida, is high and cannot be discounted.
All three appellees were alleged to be willing participants in the underlying felonies: possession and delivery of cannabis. They are responsible for the results which came about from the forces which they set in motion. When Detective Rauft was killed, the episode was still evolving. Until the scene of the crime, and the participants, were controlled and secured by the officers, the underlying felony had not terminated. Bello's shooting of the firearm was a part of the attempt to escape apprehension. The fact that the appellees were each under some form of detention, or were being held at bay by the police, or were incapacitated, will not work to absolve appellees from liability for felony murder. The legal fiction urged by appellees, that arrest terminates participation in the underlying felony and prevents liability for a further act of a co-felon, will not serve to ignore the realities and practicalities of the situation. To hold otherwise would be in contravention of the established law and would reward appellees for the fortuitous occurrence of their arrest while the situation was developing and the scene unsecured.[5]
*1062 The additional argument offered by appellee Rodriguez concerning his incapacitation also fails based on the foregoing rationale. Rodriguez was injured during the development of the entire criminal episode which he, and the others, had begun. Rodriguez was shot by Bello during the latter's attempt to escape capture by the police before Bello shot Detective Rauft. The participation of Rodriguez in the drug felony would justify his liability for the homicide unless the factfinder determines that Rodriguez' participation had otherwise terminated before the shooting of Rauft.
Our conclusion is, and we so hold, that neither the arrest nor the incapacitation of any of the appellees served to terminate the underlying felonies, and neither will operate to relieve the appellees of the ultimate consequences of the forces which they set in motion.
Therefore, we reverse the trial court's dismissal of the third degree murder charge, and remand this cause for further proceedings.
REVERSED and REMANDED.
HOBSON, A.C.J., and LEHAN, J., concur.
NOTES
[1] Appellee Rodriguez asserts that his arrest and/or wounding and incapacitation terminated his participation in the underlying felony and his liability for the homicide. We will address this contention and the ambiguity of the trial court's finding as to Rodriguez infra.
[2] For a background of the felony murder rule, and a contra view of the intent requirement, see People v. Aaron, 409 Mich. 672, 299 N.W.2d 304 (1980). See also Annot., 58 A.L.R.3d 851. Note that in Florida, the felony murder rule is legislatively created, § 782.04(4), Fla. Stat. (1981), not judicially pronounced.
[3] Section 782.04(4), Fla. Stat. (1981), has been amended. See section 782.04, Fla. Stat. (Supp. 1982). The amendment would not affect the outcome in this case.
[4] The charges for possession and delivery of cannabis have not been addressed in the present posture of this case. This appeal is limited to the legal issue of whether arrest or incapacitation precludes liability for felony murder, where the arrest or incapacitation occurs prior to the homicide.
[5] Note that the result might have been different if Bello was "holed up" in the bedroom for some longer period of time and the appellees were securely in custody, either in a jail cell, in a squad car, or perhaps even in handcuffs. However, this is not the situation here and, thus, is left for another day.